UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                )
ERICA PAYNE,                                     )
                                                )
                Plaintiff,                       )
                                                )
v.                                               )         Civil Action No. 15-13554-LTS
                                                )
CAROLYN W. COLVIN, Acting                        )
Commissioner of the Social                       )
Security Administration,                         )
                                                )
                Defendant.                       )
_____)


ORDER ON PLAINTIFF'S MOTION TO REVERSE
AND DEFENDANT'S MOTION TO AFFIRM

February 23, 2017

SOROKIN, J.

       For the reasons that follow, the Court DENIES Plaintiff's Motion to Reverse (Doc. 20)

and ALLOWS Defendant's Motion to Affirm (Doc. 22) the denial of Plaintiff's application for

disability insurance benefits ("DIB").


I.      BACKGROUND

       On May 29, 2012, Plaintiff Erica Payne filed an application for DIB.  Administrative

Record ("AR") at 196.  Her alleged onset date of disability ("AOD") is January 1, 2008, and her

date last insured ("DLI") was September 30, 2011.[1]  Id.  Plaintiff was born on July 17, 1977.  Id.

_____
[1] To be eligible for DIB, Plaintiff must "demonstrate that her disability existed prior to her DLI."  Fischer v. Colvin,
831 F.3d 31, 32 (1st Cir. 2016).  The Court will refer to the period between Plaintiff's AOD and DLI as "the
relevant time period."  See Resendes v. Astrue, 780 F. Supp. 2d 125, 139-40 (D. Mass. 2011).

at 291.  Between 1997 and 2007, Plaintiff performed a variety of jobs, including as a customer service representative, receptionist, and animal care provider.  Id. at 319.  She was thirty years old on her AOD, thirty-four on her DLI, and thirty-five when she applied for DIB.  At the time of her application, Plaintiff alleged she was disabled because of asthma, "constant infection," and allergies.  Id. at 196.

The Social Security Administration ("SSA" or "Commissioner") denied Plaintiff's application initially and upon reconsideration.  Id. at 20.  Plaintiff requested and was granted a hearing before an Administrative Law Judge ("ALJ").  Id.  Prior to the hearing, Plaintiff filed a memorandum stating that she suffered from "chronic sinusitis, tonsillar stones, asthma, vertigo, malodorous breath, bilateral feet and knee pain, anxiety, severe smoke sensitivity, . . . symptoms associated with attention deficit hyper disorder," and "severe obesity."  Id. at 271.  The hearing took place on January 22, 2014.  Id. at 40.  Plaintiff testified at the hearing and was represented by counsel.[2]  Id. at 43, 281.

On March 11, 2014, the ALJ issued a decision finding Plaintiff had not been disabled during the relevant time period.  Id. at 34.  The ALJ found that during the relevant time period, Plaintiff (1) did not engage in substantial gainful activity; (2) had the severe impairments of "recurrent sinonasal infections status post adenoidectomy" and "persistent sinus thickening and opacification of a hypoplastic left maxillary sinus status post hardware removal"; (3) did not have an impairment or combination of impairments that met or equaled a listed impairment in the Social Security regulations; (4) had the residual functional capacity to perform light work, except that she could only stand for about two or three hours over the course of an eight-hour workday and she "should avoid exposure to extreme cold, extreme heat, or pulmonary irritants

---

[2] The ALJ erroneously stated that Plaintiff's representative at the hearing was not a lawyer.  AR at 20.

such as smoke and dust"; and (5) was capable of performing past relevant work as a mail room worker, check processor, receptionist, and customer service worker.  Id. at 22-30.

Plaintiff asked the SSA's Appeals Council to review the ALJ's decision.  On August 11, 2015, the Appeals Council denied Plaintiff's request for review.  Id. at 4.  Plaintiff then filed this action *pro se*.  Doc. 1.

On May 10, 2016, Plaintiff filed the instant Motion to Reverse.  Doc. 20.  On June 21, 2016, Defendant filed the instant Motion to Affirm.  Doc. 22.  On January 25, 2017, Plaintiff requested an extension of time to respond to Defendant's Motion.  Doc. 25.  The Court granted Plaintiff's request.  Doc. 26.  Plaintiff has filed a reply, Doc. 30, and this matter is now ready for decision.


II.     LEGAL STANDARDS

   A.     Entitlement to Benefits

A claimant's entitlement to DIB turns on whether she has a "disability," defined by the Social Security Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  When considering applications for benefits, the SSA "employs a five step process to determine if an individual is disabled within the meaning of the Social Security Act."  Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citation omitted).  "All five steps are not applied to every applicant, as the determination may be concluded at any step along the process."  Id.  "The steps are:  1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the

relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the 'listed' impairments in the Social Security regulations, then the application is granted; 4) if the applicant's 'residual functional capacity' [RFC] is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her [RFC], education, work experience, and age, is unable to do any other work, the application is granted." Id. (citation omitted).

The claimant bears the burden of proof for the first four steps, and must furnish medical or other evidence of the existence of a disability. Britt v. Colvin, 125 F. Supp. 3d 349, 353 (D. Mass. 2015). If the applicant has shown "that he or she is unable to do past work . . . , the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can still perform." Seavey, 276 F.3d at 5 (citation omitted).

An ALJ must consider all of the evidence in the case record, 20 C.F.R. § 404.1520(a)(3), and resolve any conflicts in the evidence. Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). However, the ALJ need not "directly address[] in [the] written decision every piece of evidence" or make "explicit credibility findings as to each bit of conflicting testimony, so long as [her] factual findings as a whole show that [she] implicitly resolved such conflicts." N.L.R.B. v. Beverly Enters.-Mass., Inc., 174 F.3d 13, 26 (1st Cir. 1999) (citations, alterations, and internal quotation marks omitted); accord Blackette v. Colvin, 52 F. Supp. 3d 101, 119 (D. Mass. 2014).

B.    Standard of Review

This Court may affirm, modify, or reverse the Commissioner's decision upon review of the record.  See 42 U.S.C. § 405(g).  However, judicial review is limited "to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  Even where the record "arguably could justify a different conclusion," the Court must accept the Commissioner's findings of fact as conclusive if they are "supported by substantial evidence."  Whitzell v. Astrue, 792 F. Supp. 2d 143, 148 (D. Mass. 2011) (quoting Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987)) (internal quotation marks omitted); see § 405(g). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion."  Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (citation and internal quotation marks omitted).

A court "may review the ALJ decision solely on the evidence presented to the ALJ." Mills v. Apfel, 244 F.3d 1, 5 (1st Cir. 2001).  If a claimant presented new evidence to the SSA's Appeals Council, the Court may review the denial of appeal in light of that evidence, giving "great deference" to the Council's determination that the evidence "did not justify disturbing the ALJ decision," unless the Council "articulated" an "egregiously mistaken ground" for that determination.[3]  Id. at 5-6.  If a claimant presents new evidence to the Court that was not

---

[3] Plaintiff submitted to the Appeals Council various "new" records covering March 21, 1996, to March 13, 1998, and from December 17, 2013, to April 12, 2014.  AR at 5; 15-16, 101-192.  The Appeals Council erroneously stated that the records covered only 2013 to 2014, id. at 5, neglecting to mention that they also covered 1996 to 1998.  The Appeals Council found that the records did not justify disturbing the ALJ's determination because they were "about a later time" than Plaintiff's DLI.  Id.  Plaintiff has not explicitly challenged the Appeals Council's determination. However, out of an abundance of caution, the Court has reviewed, sua sponte, the records Plaintiff submitted to the Appeals Council and its determination.  While the Appeals Council was incorrect about the time period that the records cover, it was not mistaken to a degree "that undermines its refusal to alter the ALJ's conclusion" that Plaintiff was not disabled during the relevant time period.  Mills, 244 F.3d at 6.  The records – some of which are

presented to the SSA, the Court may remand for consideration of the evidence, "but only upon a showing that [the] evidence is material and that there is good cause for the failure to incorporate [it] into the record in a prior proceeding."[4] Seavey, 276 F.3d at 9 (citation and internal quotation marks omitted).

III.    PLAINTIFF'S MEDICAL RECORDS

In this section, the Court will summarize Plaintiff's medical records, focusing in particular on documents from the relevant time period.[5]

In December 1994, when she was seventeen years old, Plaintiff received jaw surgery to address a skeletal abnormality. AR at 580-81. The surgery involved the insertion of titanium implants in her jaw. Id. at 586. At the ALJ hearing, Plaintiff stated that she thinks she became disabled "six months after the jaw surgery," because she "began to experience congestion [and] chronic sinus infections," among other problems. Id. at 56, 58. However, her lawyer at the hearing acknowledged there were "a number of years" in between the surgery and her AOD

---

not actually records, but merely articles about ailments that Plaintiff claims are disabling, see AR at 151-90 – concern years that are well outside the relevant time period, and are largely about medical appointments during which Plaintiff complained of sinus issues. The records do not compel the conclusion that Plaintiff was disabled during the relevant time period. Thus, under any standard, especially the applicable "great deference" standard, the Court finds the Appeals Council's determination was justified. Mills, 244 F.3d at 6.

[4] In support of her Motion to Reverse, Plaintiff discusses various symptoms and diagnoses that postdate the Appeals Council's review. See, e.g., Doc. 20 at 6-8; Doc. 30 at 1. The Court finds that Plaintiff's discussion of her recent health symptoms and diagnoses does not constitute new, material evidence that merits remand to the SSA. See Seavey, 276 F.3d at 9. Plaintiff also suggests she would like to amend her AOD, complaining that she would not have chosen January 1, 2008, as the AOD if she had known she would need to provide "extensive medical documentation" to prove she was disabled as of that date. Doc. 20 at 5. Because the Court is limited to review of the AR, see Mills, 244 F.3d at 6, Plaintiff may not amend her AOD at this stage.

[5] The Court, like the ALJ, reviews "evidence from the surrounding time periods to draw conclusions regarding the relevant time period." Arrington v. Colvin, __ F. Supp. 3d __, 2016 WL 6561550, at *9 (D. Mass. 2016) (citation omitted). The Court notes, however, that post-DLI medical records are more likely to be relevant where contemporaneous medical evidence is "lacking," which is not the case here. Fischer, 831 F.3d at 36 (citation omitted).

during which she worked, i.e., engaged in substantial gainful activity.  Id. at 58; see also id. at 319 (Plaintiff's work history).

Plaintiff presented no medical records from 2007 or 2008.  Id. at 59.  The earliest medical record during the relevant time period is from February 19, 2009, when Plaintiff visited Dr. Herbert Krohn.  Id. at 525-26.  Plaintiff complained of a one-day old sinus infection, for which she was prescribed Zithromax and Claritin.  Id.

On April 15, 2009, Plaintiff visited Dr. Sarah Russell.  Id. at 522.  She "appear[ed] well" but presented "with symptoms consistent with [neck] muscle strain in the setting of working in data entry in a less than ergonomically correct work station."[6]  Id.  Plaintiff rated her pain at three on a scale of zero to ten.  Id. at 523.  She was instructed to take ibuprofen and to stretch after the pain resolved.  Id. at 522.

On December 7, 2009, Plaintiff visited an urgent care office, complaining that she had had a sinus infection for three days, with a "sore throat and runny nose," along with chills and "increased facial pressure."  Id. at 520.  She again rated her pain at three, and was discharged with a regimen of nasal spray and Mucinex.  Id. at 519.

On December 8, 2009, Plaintiff visited Dr. Stacey Tutt Gray, and explained that she had sinus infections "two or three times per year."  Id. at 441.  Dr. Gray examined Plaintiff and found that although Plaintiff was "well-appearing" and "in no acute distress," she had severe adenoid hypertrophy with severe inflammation and should receive an adenoidectomy.[7]  Id. at 442.

---

[6] The ALJ did not mention that Plaintiff worked in data entry during the period she claimed to be disabled, much less analyze whether that work constituted substantial gainful activity.  See supra Section II.A (stating that engagement in substantial gainful activity precludes a finding of disability).

[7] Adenoid hypertrophy is the inflammation of tissue "in the passage that connects the nasal cavity to the throat." University of Texas Medical Branch, ENT Problems – Adenoid Hypertrophy & Adenoiditis, https://www.utmb.edu/oto/sections/pediatric/education/adenoid_hypertrophy.asp.  An adenoidectomy is surgery to remove adenoid tissue.  Id.

Plaintiff received an adenoidectomy on January 20, 2010.  Id. at 432.  On February 10, 2010, Dr. Gray saw Plaintiff and examined her, finding her to be "doing very well postoperatively" and to be "feeling quite well."  Id.

On February 18, 2010, Plaintiff visited Dr. Ariel Frey-Vogel.  Id. at 511.  Plaintiff complained that she was "tired all of the time" but said she did not feel depressed.  Id.  After physical examination, Dr. Frey-Vogel found that (1) Plaintiff's nasal passages were unobstructed and she had no nasal discharge; (2) her throat was a normal color without tonsillar englarement; (3) her breathing was clear; (4) she had normal strength, coordination and gait; and (5) she was "alert and oriented for age, normal mood and affect."  Id. at 514.

On March 31, 2011, Plaintiff visited Dr. Frey-Vogel.  Id. at 487.  She complained of arm pain and foot pain.  Id.  With respect to her foot, Plaintiff stated that when she was on her feet for more than eight hours, the soles of her feet would "get bright red and painful" so that she could not "stand on them."  Id.  She complained that this condition "prevent[ed] her from taking a job where she needs to be on her feet."  Id.  Dr. Frey-Vogel found the etiology of Plaintiff's foot pain "[u]nclear" and recommended evaluation by a rheumatologist.  Id. at 488.

On August 31, 2011, Plaintiff visited Dr. Gray and told her that "she doesn't really get sinus infections anymore, but she does continue to have 'flare ups' of her symptoms."  Id. at 431.  Plaintiff told Dr. Gray that that "she still gets extremely systematically ill," and "is so sick that she is incapacitated and has to be on 'bed rest' for at least a week."  Id.  Plaintiff said that this type of "systematic[] ill[ness]" occurs "a few times per year, most recently a few months ago."  Id.  Dr. Gray wrote that Plaintiff's "recurrent symptoms are a bit strange," and "[i]t sounds as if she is experiencing recurrent viral infections."  Id.  Dr. Gray stated Plaintiff was "well-appearing" and "in no acute distress."  Id.

On September 1, 2011, Plaintiff visited Dr. Frey-Vogel. Id. at 479. She stated that she had foot pain, which kept "her off of her feet." Id. at 480. Dr. Frey-Vogel gave her the contact information for a rheumatologist so she could be evaluated. Id.

On September 16, 2011, Plaintiff saw Dr. Gray. Id. at 429. Plaintiff said she was "so sick that . . . she cannot have a steady job," and "wonder[ed] about whether this would qualify for disability." Id. Dr. Gray "explained that [Plaintiff did] not have a sinus infection," and wrote "unfortunately I do not have an answer for her," once again finding "[h]er recurrent symptoms are a bit strange." Id. Dr. Gray once again found Plaintiff was "well-appearing" and "in no acute distress." Id.

The relevant time period ended on September 30, 2011.

On October 26, 2011, Plaintiff visited Dr. Frey-Vogel. Id. at 477. Plaintiff told Dr. Frey-Vogel that a specialist to whom she had been referred for knee pain said "there was nothing wrong," she had no arthritis, and "her exam was normal." Id. With respect to her sinus problems, Dr. Frey-Vogel wrote that Plaintiff did not have an active infection, and stated: "Her episodes sound like recurrent viral infections and my sense is that she does not have more than the average person . . . ." Id. at 478.

On November 21, 2011, Plaintiff saw Dr. Elena Eberle, a rheumatologist, who wrote that Plaintiff "presented with bilateral feet pain and swelling, which she experiences after a few hours of walking." Id. at 475. Dr. Eberle wrote that Plaintiff's foot pain "happens just after 2-3 hours of walking," and that Plaintiff "found that feet elevation, massage and rest alleviate her symptoms." Id. Dr. Eberle found the etiology of Plaintiff's foot pain "unclear," and stated there was no evidence of systemic connective tissue disease or inflammatory arthritis. Id. at 475-76. Dr. Eberle referred Plaintiff to a podiatrist. Id. at 476.

On February 17, 2012, Plaintiff visited Dr. Johnson Wong for an allergy and immunology consultation. Id. at 465. Plaintiff told Dr. Wong that her hobbies were reading, watching movies, and walking. Id. at 466. Dr. Wong found Plaintiff's pulmonary symptoms and systemic complaints were possibly indicative of sleep apnea, so he scheduled Plaintiff for a sleep study. Id. at 466-67.

On February 24, 2012, Plaintiff visited Dr. Gray, complaining that she "continued to have recurrent episodes of illness," and stating that "one of the things that is really bothering her a lot are her tonsils." Id. at 426.

On May 21, 2012, Plaintiff told Dr. Frey-Vogel that she had been referred to an orthopedist for pain in the right knee and the orthopedist told her "there was nothing wrong." Id. at 457.

On May 25, 2012, the sleep study that Dr. Wong had scheduled took place. Id. at 447. The study "demonstrated no evidence of obstructive sleep apnea or any significant sleep-disordered breathing." Id. at 449.

On June 7, 2012, Plaintiff saw Dr. Joseph Abate for "further evaluation of [her] right knee." Id. at 578. Dr. Abate examined Plaintiff and found "tenderness particularly of the right lateral hamstring," but found no swelling or instability in the knee. Id.

On July 20, 2012, Plaintiff asked to have her nickel levels tested, apparently out of concern that there was "nickel release" in her system from the titanium jaw implants. Id. at 568.

On August 26, 2012, Plaintiff was informed that she "test[ed] mildly positive to allergy to titanium." Id. at 630. Plaintiff had an allergy test done that was "scored according to 2 scoring systems, one of which was equivocal and the other of which was 760 with a 751 to 1600 being positive." Id. at 650. Plaintiff's nickel levels were found to be normal. Id. at 631.

On October 3, 2012, Plaintiff saw Dr. Frey-Vogel. Id. at 546. At the appointment, Plaintiff expressed interest in having the titanium implants removed from her jaw. Id. at 548. Dr. Frey-Vogel expressed concern about whether such a procedure would improve Plaintiff's symptoms. Id. As of the date of the appointment, nearly a year after Dr. Eberle told her to see a podiatrist, Plaintiff had not yet seen one. Id. at 546. Ultimately, Plaintiff did see a podiatrist, who "could not find a clear cause" for her foot pain and recommended she take a vitamin D supplement. Id. at 617.

On December 14, 2012, Plaintiff saw Dr. Zachary Peacock, inquiring about removing the titanium implants in her jaw. Id. at 540. Plaintiff was "convinced that these titanium plates are the source of her chronic ailments," but said she had had "difficulty with having providers believe" it. Id. Dr. Peacock explained that he had no evidence that removal of the titanium would help solve Plaintiff's ailments. Id. at 541. Plaintiff told Dr. Peacock that "her recovery period [would] be very much prolonged compared to an average patient." Id.

In April 2013, Plaintiff had parts – though not all, because that was not feasible – of her titanium jaw implants removed. Id. at 272. At a post-operative checkup on May 21, 2013, Plaintiff reported that "overall she is doing well but still has mild congestion," which was "improved with over-the-counter Sudafed and Ocean nasal spray." Id. at 647. Plaintiff received a physical exam, which was "unremarkable." Id.

On September 4, 2013, Plaintiff saw Dr. Frey-Vogel, complaining about "multiple medical issues," including that she felt "very congested" and was "[v]ery sensitive to anything with scent." Id. at 617. A respiratory exam revealed clear breath sounds bilaterally with "no accessory muscle use." Id. at 618.

On October 5, 2013, Plaintiff visited Dr. Frey-Vogel. Id. at 614. According to Dr. Frey-Vogel's notes, until recently, Plaintiff "had had congestion, rhinorrhea,[8] and was in bed for a week and was getting better." Id. However, a week before the visit, Plaintiff "went to an amusement park and was exposed to a lot of smoke." Id. Afterward, Plaintiff "started having hoarse throat and sore throat." Id. At the appointment, Dr. Frey-Vogel also completed a physical capacities evaluation for Plaintiff, consisting largely of a checklist, which concerned Plaintiff's abilities to do various tasks during an eight-hour workday. Id. at 572-75. Dr. Frey-Vogel opined that Plaintiff's work abilities were highly restricted. Id. For example, Dr. Frey-Vogel stated that, in an eight-hour work day, Plaintiff could sit for only two to three hours; could stand or walk for less than one hour; could never lift or carry more than five pounds; and would need to take "frequent" unscheduled breaks "due to foot pain." Id. Moreover, in response to a multiple-choice question about how often Plaintiff's symptoms would be "severe enough to interfere with the attention [and] concentration required to perform simple work-related tasks," Dr. Frey-Vogel checked off "Constantly." Id. at 572.

On December 4, 2013, Plaintiff saw Dr. Frey-Vogel, complaining of back pain, for which she had recently visited the emergency room. Id. at 675. Plaintiff had previously been given valium and oxycodone but did not want to take narcotics and took Motrin instead, which "help[ed]." Id. Plaintiff complained about various other ailments, including "facial pain, hoarseness, ringing in ears, leg muscular pain, [and] extreme fatigue." Id. She also stated that she had had "a few episodes of falling." Id. Dr. Frey-Vogel found it "[u]nclear what is causing her falls" and explained to Plaintiff that her symptoms were consistent with depression. Id. at

---

[8] Rhinorrhea is "a runny nose." Stanford Children's Hospital, Runny Nose, http://www.stanfordchildrens.org/en/service/ear-nose-throat/conditions/chronic-rhinorrhea.

676.  Plaintiff disagreed with this assessment and instead attributed her ailments to a nickel allergy.  Id.

On January 10, 2014, Plaintiff saw Dr. Sebastian Unizony to determine whether she had fibromyalgia.  Id. at 700.  Dr. Unizony found Plaintiff's symptoms "suggest[ed] myofascial pain syndrome or fibromyalgia."  Id. at 701.

IV.    DISCUSSION

Construing Plaintiff's *pro se* filings liberally, she argues that the ALJ erred by:

(1)  not inquiring about her ability to give coherent testimony at the hearing, Doc. 20 at 3;

(2)  stating Plaintiff was able to "go to amusement parks," when in fact she only went to one amusement park and got sick there, id.;

(3)  finding Plaintiff could stand for two to three hours during an eight-hour workday and that her walking ability was normal, even though Plaintiff said she could not stand for more than 10 minutes without pain, id.;

(4)  finding Plaintiff could work indoors, in spite of Plaintiff's need for "an environment that is entirely fragrance free, devoid of any atmospheric conditions," id. at 4; and

(5)  finding fibromyalgia was not one of Plaintiff's medically determinable impairments, id. at 4-5.[9]

The Court will address each of these arguments in turn.

---

[9] Plaintiff also complains that her lawyer at the ALJ hearing was ineffective in a variety of ways, including that he told her she "did not need witnesses" and that he failed "to explain how disabling [her] conditions were."  Doc. 20 at 1-2.  Even assuming these facts are true, ineffective assistance of counsel is not a cognizable claim in a Social Security appeal.  Hohman v. Colvin, 2015 WL 4198986, at *18 (W.D. Mo. 2015) (collecting cases); see also Castrodad-Soto v. Rivera-Sanchez, 103 Fed. Appx. 401 (1st Cir. 2004).

A.    The Alleged Failure to Inquire Into Plaintiff's Competency

Plaintiff complains that the ALJ did not inquire about her ability "to give coherent testimony" at the hearing, even though Plaintiff said she was "groggy" and "on a lot of medications," and even though she exhibited signs of confusion, such as claiming she did not know her age.  Doc. 20 at 3; AR at 44, 62.  Plaintiff states she "was confused, disoriented and ha[d] trouble remembering details, because of the medication I was taking."  Doc. 20 at 3.  Plaintiff suggests that, as a result of her disorientation, she gave incorrect answers during the hearing.  See id. ("When asked if I had an[y] issues working at the [Massachusetts Department of Revenue], I mistakenly said no. . . .  I had been unable to recall [various ailments I suffered while working there], because of my impairment.").

The Court does not find that the ALJ's lack of inquiry into Plaintiff's competency was reversible error, for two independent reasons, either of which is sufficient on its own.  First, Plaintiff did not express that she would be more able "to give coherent testimony" at some future date, and there is reason to question whether such a date even exists, as Plaintiff's confusion about her ailments and limitations is a recurrent problem.  For instance, Plaintiff states she was "confused" and "made a lot of mistakes when filling out [the] initial application and Functional report."  Doc. 20 at 5.  Specifically, Plaintiff claims she mistakenly said she rode a bicycle and could lift thirty to forty pounds, neither of which was true.  Id.; see also id. at 8 (Plaintiff complaining that she "failed to express just how . . . truly limited" she is).  Second, neither Plaintiff's lawyer nor the ALJ – who, unlike this Court, were able to observe Plaintiff at the hearing – expressed concern about her competency to testify.  Cf. United States v. Quintieri, 306 F.3d 1217, 1233-34 (2d Cir. 2002) (rejecting a claim that "the district court should have held a [competency] hearing . . . after [the defendant] complained that he felt dizzy because [he had

received] the wrong psychiatric medication," because (1) the district court "was able to observe [his] demeanor and had the benefit of hearing [him] directly," and (2) his lawyer had found him "able to understand the proceedings"). Thus, the Court rejects Plaintiff's argument that the ALJ erred.

B.     The ALJ's Statement About "Amusement Parks"

Plaintiff complains that the ALJ erred in writing that she was able to go to "amusement parks," given that she "only went once and it resulted in me getting ill" because she was exposed to smoke. Doc. 20 at 3.

1.     Background

On October 5, 2013, Plaintiff visited Dr. Frey-Vogel. AR at 614. According to Dr. Frey-Vogel's notes, until recently, Plaintiff "had had congestion, rhinorrhea, and was in bed for a week and was getting better." Id. However, a week before the visit, Plaintiff "went to an amusement park and was exposed to a lot of smoke." Id. Afterward, Plaintiff "started having hoarse throat and sore throat." Id.

During the hearing before the ALJ, Plaintiff said she had "no life" due to her "unpredictable" health. Id. at 72. She complained that she "can't go to amusement parks because of the smoke exposure." Id.

In his opinion, the ALJ stated: "In October of 2013, [Plaintiff] noted that her symptoms had improved somewhat before she encountered some smoke at a local amusement park." Id. at 28. Later in the opinion, the ALJ apparently referenced this episode. In explaining why he gave

Dr. Frey-Vogel's opinion about Plaintiff's work abilities only "minimal probative weight," the

ALJ stated:

> I note that Dr. Frey-Vogel's opinion is inconsistent with the claimant's sporadic, effective treatment record and reported activities of daily living. In particular, it is difficult to reconcile Dr. Frey-Vogel's far-reaching limitations with the claimant's purported ability to cook, clean, drive, *go to amusement parks*, do yoga/pilates, walk at the mall, work as a [sales person for a skin care company from 2010 to 2012], shop for groceries, care for a pet, lift up to forty pounds, and attend her medical appointments.

Id. at 30 (emphasis added).

### 2.  Discussion

The ALJ erred in characterizing Plaintiff's attendance at amusement parks:  Plaintiff did

not "purport[]" to be able to go to amusement parks, but in fact testified that she *cannot* go to

them.  Id. at 72.  However, this error was harmless, and remand would "amount to no more than

an empty exercise."  Ward, 211 F.3d at 656.  The ALJ cited "go[ing] to amusement parks" as

only one of eleven activities or abilities that were inconsistent with Dr. Frey-Vogel's opinion.

The record shows that either at the time of her application for benefits or during the relevant time

period, Plaintiff claimed to be able to engage in nine of the other ten activities.[10]  AR at 46-48;

343-47; 378-82; 504.  Thus, although "the ALJ provided one or more invalid reasons for"

discounting Dr. Frey-Vogel's opinion, he "also provided valid reasons that were supported by

the record," rendering his error harmless.  Molina v. Astrue, 674 F.3d 1104, 1115 (9th Cir. 2012)

(citations omitted).

---

[10] The ALJ erred in stating that Plaintiff could "lift up to forty pounds."  AR at 30.  In fact, Plaintiff stated on July 6, 2012, that she could only "lift items under 30-40 lbs."  Id. at 344.  The ALJ's error was harmless, however, because he found that, through the DLI, Plaintiff had the RFC "to perform light work," which only requires the ability to lift up to twenty pounds.  20 C.F.R. § 404.1567(b).

Aside from Plaintiff's own statements about her abilities, there were other valid reasons to discount Dr. Frey-Vogel's opinion that Plaintiff's abilities were highly restricted. For one thing, Dr. Frey-Vogel's opinion about Plaintiff's physical capacities is minimally probative about the relevant time period, given that she offered the opinion in October 2013, over two years after the period ended, and that she did not claim her opinion was retrospective, even though retrospective medical opinions are permitted in Social Security cases. See, e.g., Johnson v. Shalala, 60 F.3d 1428, 1432-33 (9th Cir. 1995). Furthermore, Dr. Frey-Vogel's opinion was entitled to little weight because it is "brief" and "conclusory," without "adequate supporting explanations." Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); Coggon v. Barnhart, 354 F. Supp. 2d 40, 53 (D. Mass. 2005). See AR at 572-75; 20 C.F.R. § 404.1527(c)(3).

Most critically, as the ALJ noted, Dr. Frey-Vogel's opinion is inconsistent with Plaintiff's treatment record, both during the relevant time period and in the surrounding periods. See Bourinot v. Colvin, 95 F. Supp. 3d 161, 175-76 (D. Mass. 2015) (explaining that absence of supporting evidence and inconsistency with the AR are valid reasons to discount a treating source's opinion). As is almost self-evident from a review of Plaintiff's medical records, see supra Section III, Plaintiff's documented ailments were hardly disabling during the relevant time period or in the surrounding time periods. Plaintiff presented absolutely no medical records from 2007 or 2008, the first year she was allegedly disabled. In 2009 – when Plaintiff was "working in data entry" – she complained of neck muscle strain and sinus infections, which she said occurred "two or three times per year." AR at 441, 522. In 2010, Plaintiff received an adenoidectomy, and afterward she was found to be doing well, with clear breathing and unobstructed nasal passages. Id. at 432, 511. In 2011, Plaintiff complained of foot pain, but

only after she was on her feet for eight hours or "after a few hours of walking." Id. at 475, 487.

She also complained of sinus symptoms, while acknowledging that she did not "really get sinus

infections anymore." Id. at 431. During the relevant time period and even thereafter, doctors

repeatedly found that, notwithstanding Plaintiff's complaints, she appeared "well" and objective

medical evaluations either did not substantiate her symptoms or could not produce a diagnosis to

explain them; relatedly, doctors stated on several occasions that Plaintiff's symptoms were

"strange" and their etiology was unclear. E.g., id. at 429, 431, 442, 449, 457, 475-76, 523, 617-

18, 647, 676. The month after the relevant time period ended, Dr. Frey-Vogel herself stated that

she did not think Plaintiff suffered from more sinus infections "than the average person." Id. at

478. Moreover, a specialist told Plaintiff, in response to her complaint of knee pain, that "there

was nothing wrong" and "her exam was normal." Id. at 477. As for Plaintiff's complaint of foot

pain, neither a rheumatologist nor a podiatrist could find any cause for it. Id. at 475-76, 617. In

light of Plaintiff's own statements about her abilities and the medical record as a whole,

substantial evidence supports the ALJ's determination that Dr. Frey-Vogel's non-retrospective,

conclusory opinion about Plaintiff's physical capacities was entitled to little weight,

notwithstanding the erroneous statement about "amusement parks."


C.      The ALJ's Findings Regarding Plaintiff's Alleged Foot and Knee Pain

Plaintiff complains: "I told the [ALJ] that I cannot stand for more than 10 minutes

without pain, and he said to the [Vocational Expert] that I could stand 2-3 hours[] and walk

normally, and completely disregarded what I said in my testimony." Doc. 20 at 3. Relatedly, in

her reply brief, Plaintiff complains that, at step two of the sequential analysis, the ALJ found her

foot and knee pain to be non-severe.[11]  Doc. 30 at 4; see also AR at 23 (ALJ's explanation that

"the record does not reflect evidence of limitations stemming from" Plaintiff's alleged foot and

knee pain "that would cause [her] more than a minimal work related limitation").

Plaintiff's complaints are meritless.  Plaintiff is correct that she told the ALJ at the

hearing on January 22, 2014, that she was only able to stand for ten minutes.  AR at 56.

However, when asked by the ALJ how long she had only been able to stand that long, she said,

"That's been within the last year, Your Honor."  Id.  Thus, Plaintiff's ability to stand for only ten

minutes began in January 2013, well after the relevant time period ended in September 2011.

When the ALJ asked Plaintiff how long she could stand in 2008, when the relevant time period

began, she answered, "We'll say two to three hours, Your Honor."  Id. at 66-67.  Moreover,

when the ALJ asked Plaintiff how far she could walk in 2008, Plaintiff answered, "[T]he foot

pain wasn't that bad and so normal everyday walking."  Id. at 67.  Furthermore, in March 2010,

Plaintiff told Dr. Frey-Vogel that she "walk[ed] at the mall," which Dr. Frey-Vogel characterized

as "moderate exercise."  Id. at 504.  The Court also notes, once again, that during the relevant

time period, Plaintiff complained that she experienced foot pain only after she had been on her

feet for more than eight hours.  Id. at 487.  After the relevant time period ended, in November

2011, Plaintiff complained of foot pain only "after 2-3 hours of walking," and in February 2012,

Plaintiff told a doctor that one of her hobbies was "walking."  Id. at 466, 475.  As for Plaintiff's

alleged knee pain, an orthopedist found, after examining Plaintiff, that "there was nothing

wrong" and "her exam was normal."  Id. at 477.  Thus, there is substantial evidence – consisting

---

[11] A "reply brief is not the proper place to raise new arguments," United States v. Bradstreet, 207 F.3d 76, 80 n.1 (1st Cir. 2000) (citations omitted), and pro se "litigants are not exempt from procedural rules," Dutil v. Murphy, 550 F.3d 154, 158 (1st Cir. 2008) (citations omitted).  Nevertheless, "to guard against the loss of pro se claims due to technical defects," the Court elects to consider this argument.  Id. (citations omitted).

of both "objective medical evidence" and Plaintiff's own statements regarding the "limiting effects" of her symptoms – to support the ALJ's findings that during the relevant time period, Plaintiff could walk normally and stand for "about two or three hours over the course of an eight-hour workday," and any alleged foot and knee pain posed no more than minimal work-related limitations. Id. at 23-24; Thomas v. Colvin, 826 F.3d 953, 960 (7th Cir. 2016).

  D.  The ALJ's Finding that Plaintiff Could Work Indoors

  Plaintiff complains about the ALJ's finding that she could work indoors. Doc. 20 at 4. She states "this would not be enough of an accommodation" because "any scent/odor that a fellow employee has on them" – even laundry detergent or deodorant – will "trigger [her] off." Id. Plaintiff says she "require[s] an environment that is entirely fragrance free, devoid of any atmospheric conditions," and that this requirement prevents her from working either indoors or outdoors. Id.

  The Court rejects Plaintiff's argument that the ALJ erred, for three independent reasons, any of which is sufficient on its own. First, Plaintiff appears to have only started complaining of extreme scent sensitivity on September 4, 2013, nearly two years after the relevant time period ended. AR at 617. Second, not even Dr. Frey-Vogel's October 2013 opinion that Plaintiff is highly restricted states she that is severely sensitive to scent or odor; rather it merely states she suffers from "severe smoke sensitivity." Id. at 572. Third, there is simply no evidence in the record – particularly during the relevant time period, but even afterward – that Plaintiff is unable to be around any scents or odors, as she claims. On the contrary, in her July 6, 2012, function report, Plaintiff claimed that, "on a regular basis," she went to the grocery store and "places to eat," id. at 347, which are obviously not environments that are "entirely fragrance free" and

"devoid of any atmospheric conditions." Thus, substantial evidence supports the ALJ's finding that during the relevant time period, Plaintiff could work indoors.

E.      The ALJ's Finding Regarding Fibromyalgia

Plaintiff complains that the ALJ found "insufficient evidence in the present record to establish a medically determinable impairment of fibromyalgia." AR at 23; see Doc. 20 at 4-5. In making this finding, the ALJ noted that Dr. Unizony had "recently proferred a diagnosis of fibromyalgia to explain the claimant's alleged symptoms," but stated that "the record lacks evidence of a history of widespread pain or the requisite finding of tender points." AR at 23. Plaintiff argues this reasoning was "inaccurate," because Dr. Unizony's report stated that "[s]everal trigger points" were present, and further stated that Plaintiff's symptoms "suggest myofascial pain syndrome or fibromyalgia." Doc. 20 at 4-5.

The ALJ did not err, for three independent reasons, any of which is sufficient on its own. First, Dr. Unizony did not conclusively determine that Plaintiff suffers from fibromyalgia. Rather, he found that her symptoms "suggest myofascial pain syndrome _or_ fibromyalgia," AR at 701 (emphasis added), which are distinct diseases. See Mayo Clinic, Myofascial Pain Syndome – Complications, http://www.mayoclinic.org/diseases-conditions/myofascial-pain-syndrome/basics/complications/con-20033195 (stating "research suggests that myofascial pain syndrome may develop into fibromyalgia in some people"). Second, even if Dr. Unizony had diagnosed Plaintiff with fibromyalgia, substantial evidence supports the ALJ's determination that there is no evidence of a history of widespread pain, particularly during the relevant time period and even afterward. See generally supra Section III and Section IV.B.2 (reviewing Plaintiff's medical history); see also SSR 12-2p, 2012 WL 3104869, at *2-3 (noting that a history of

widespread pain is necessary to be diagnosed with fibromyalgia). Third, substantial evidence supports the ALJ's determination that there was no evidence of the "requisite finding of tender points." Although Dr. Unizony stated that "[s]everal trigger points [were] present," AR at 700, that vague statement does not satisfy either of the two sets of diagnostic criteria that the SSA uses to establish fibromyalgia as an impairment. See SSR 12-2p, 2012 WL 3104869, at *3 (noting that, to satisfy one set of diagnostic criteria, "[a]t least 11 positive tender points" must be found). Thus, substantial evidence supports the ALJ's finding that there was insufficient evidence to establish fibromyalgia as a medically determinable impairment.

V.      <u>CONCLUSION</u>

        For the foregoing reasons, the Court DENIES Plaintiff's Motion to Reverse (Doc. 20) and ALLOWS Defendant's Motion to Affirm (Doc. 22).


                                SO ORDERED.

                                 /s/ Leo T. Sorokin
                                Leo T. Sorokin
                                United States District Judge